[Cite as *State v. Miller*, 2012-Ohio-6115.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HENRY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 7-12-07

    v.

GREGORY DAVID VESTLE MILLER,        **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Napoleon Municipal Court
Trial Court No. 11CRB681

**Judgment Affirmed**

Date of Decision: December 26, 2012

**APPEARANCES:**

    *Keith H. Schierloh*  for Appellant

    *Trevor M. Hayberger*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Gregory David Vestle Miller, appeals the Napoleon Municipal Court's judgment entry of conviction and sentence. We affirm.

{¶2} On November 10, 2011, Miller had an argument with Candy Myers, his girlfriend with whom he cohabitated from August 18, 2011 to November 10, 2011, while the two were driving to Wal-Mart. (Dec. 8, 2011 Tr. at 9, 13-15, 42). During the argument, Miller struck Myers in the stomach with a closed fist. (*Id*. at 9, 15).

{¶3} On November 11, 2011, a complaint was filed in the Napoleon Municipal Court of Henry County, Ohio charging Miller with one count of domestic violence in violation of R.C. 2919.25(A), a first degree misdemeanor. (Doc. No. 1). On that same day, the trial court issued Myers a temporary protection order ("TPO") and Miller entered a plea of not guilty to the charge. (Doc. No. 5).

{¶4} On December 8, 2011, the matter proceeded to a bench trial, and the trial court found Miller guilty. (Doc. No. 20). On January 5, 2012, the trial court sentenced Miller to 30 days in jail but suspended 29 days and placed Miller on community control for one year. (Doc. No. 22).

{¶5} On January 19, 2012, Miller filed a notice of appeal. (Doc. No. 25). This first appeal was assigned appellate case no. 7-12-02; however, the case was dismissed for lack of a final, appealable order.

{¶6} On May 3, 2012, the trial court resentenced Miller to 30 days at CCNO, with 29 days suspended and credit for one day served. (Doc. No. 30). The 29 days were suspended upon conditions that Miller have no other offenses of violence for two years and complete an assessment through AJA Behavioral and comply with the treatment plan. (*Id.*). The trial court also placed him on one year of community control under the supervision of the court. (*Id.*).

{¶7} On May 21, 2012, Miller filed a notice of appeal. (Doc. No. 31). Miller now appeals raising two assignments of error for our review. Since his assignments of error raise similar issues, we elect to combine them for review, though we will address them out of the order presented in his brief.

**Assignment of Error No. II**

**The trial court erred when it overruled the defedendant's [sic] request for Criminal Rule 29 Motion to dismiss regarding lack of evidence and the failure to prove the elements beyond a reasonable doubt.**

**Assignment of Error No. I**

**The trial court erred to the prejudice of appellant, when it entered a judgment of conviction, where such judgment was against the manifest weight of the evidence.**

{¶8} In his second assignment of error, Miller argues that the trial court erred by failing to grant his Crim.R. 29 motion to dismiss for a lack of venue and evidence to prove that the victim and he were household members. In his first assignment of error, Miller argues that the judgment of conviction was against the manifest weight of the evidence.

{¶9} Crim.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction for such offense or offenses.

"Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), syllabus.

{¶10} This court has previously found that the *Bridgeman* standard "must be viewed in light of the sufficiency of evidence test * * *." *State v. Foster*, 3d Dist. No. 13-97-09, *2 (Sept. 17, 1997). When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, (1981), paragraph two of the syllabus.

{¶11} On the other hand, to determine whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶12} The criminal offense of domestic violence is codified in R.C. 2919.25, which provides that: "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). As used in this section, "family or household member" includes "a person living as a spouse." R.C. 2919.25(F)(1)(a)(i). "'Person living as a spouse' means a person * * * who otherwise is cohabiting with the offender, or who otherwise has cohabited

with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶13} Candy R. Myers testified that, on November 10, 2011, her father dropped her off at the Napoleon Library where she waited for Miller to pick her up after he was finished working for the day. (Dec. 8, 2011 Tr. at 6). Myers testified that, around 4:00 to 4:30 p.m. that day while she was waiting for Miller to pick her up, Miller telephoned her, and they began an argument about Miller using an internet dating site to find other women. (*Id*. at 6-7). During the argument, Miller told Myers that he was not going to return her car, which he had, and Myers told Miller that if he did not return her car immediately, she would call the police. (*Id*. at 7). Myers testified that, about 20 to 25 minutes later, Miller came with her vehicle and was very angry with her. (*Id*. at 7-8). Myers testified that Miller wanted to drive the car to Wal-Mart to cash his check, but she insisted that she drive the vehicle since it belonged to her. (*Id*. at 8). Myers testified that, as she was driving Miller to Wal-Mart, Miller was yelling and cussing at her, because she asked him whether he intended to give her the money he owed to her niece and her daughter. (*Id*.). According to Myers, at this point Miller starting calling her "April," the name of Miller's ex-wife, and stated that she, Myers, was keeping him from his children. (*Id*. at 9). Myers told Miller that she was not April and was not

trying to keep him from seeing his children, and, in fact, that she had been helping him try to see his children since he moved to Ohio from Alabama. (*Id*.).

{¶14} Myers testified that, as they turned left towards Wal-Mart, Miller struck her in the abdomen causing her to vomit in her mouth. (*Id*.); (*Id*. a 15). Myers testified that she went into the Wal-Mart parking lot, parked the car, and exited the vehicle toward the building, walking at a "very fast pace." (*Id*. at 9-10). According to Myers, Miller continued yelling and screaming at her as they entered Wal-Mart, and Miller said "that he was going to hit me again and that he was going to run my ass over." (*Id*. at 10, 11). Myers testified that a Wal-Mart customer service representative called the police. (*Id*.). Myers testified that the Wal-Mart customer service representative escorted her to the back of the store, where they waited for the police to arrive. (*Id*. at 11). She testified that, subsequent to talking with the police, she went to the hospital since she was in a lot of pain. (*Id*. at 12). Myers testified that she has several stomach issues, including GERD, acid reflux, and gastritis. (*Id*.). Myers testified that the doctor told her she had internal bruising, and Myers identified State's Exhibit A as a copy of the emergency room report with a final diagnosis of "abdominal pain, headache, anxiety attack." (*Id*. at 12-13).

{¶15} Myers testified that, at the time of the incident, she was Miller's girlfriend, and she lived with Miller from August 18, 2011 until November 10,

2011 either at her residence or Miller's cousin's residence. (*Id.* at 13-14). Myer testified that Miller spent several nights with her during that time, and they had a sexual relationship together. (*Id.* at 14). She testified that they prepared meals for each other, bought food for one another, and she washed both their clothes. (*Id.* at 14-15). Myers testified that they lived together essentially every night between the dates mentioned above. (*Id.* at 15).

{¶16} On cross-examination, Myers testified that Miller struck her with his right hand left of the center of her abdomen as she was turning the vehicle to the left. (*Id.* at 20). Myers testified that the vehicle is a stick-shift, and the clutch is "down in the center." (*Id.* at 20-21, 8). Myers testified that she passed by the Wal-Mart clerks and customers, without mentioning that Miller had hit her, heading for the customer service counter because she wanted someone to help her. (*Id.* at 22-23). Myers testified that the second sentence from the emergency room reports states "[t]here's no acute change when compared with February 2, 2000 study." (*Id.* at 25). Myers testified that Miller helped to pay her car payment while they lived together, and she was asking him about money for the car the day of the incident, though she did not believe they were going to continue their relationship. (*Id.* at 26). Myers testified that she was wearing her seatbelt the day of the incident, but Miller was not wearing his seatbelt. (*Id.*).

{¶17} Terina Losey, the customer service manager at the Wal-Mart in Napoleon, testified that she was working at the front-end customer service station on November 10, 2011. (*Id*. at 28). Losey testified that, on that particular day, that she witnessed a loud disturbance in the front of the store after a couple entered the store. (*Id*. at 29). Losey testified that, as the couple was standing in line at the customer service center, the man was verbally abusive, and she overheard the woman say to the man that she should tell them that he hit her. (*Id*. at 30). Losey testified that she asked the woman if she could help her, and the woman asked her to call the police. (*Id*.). Losey testified that she called the police, came around the counter and hugged the woman, and escorted her to the back office where she could have privacy while they waited for the police. (*Id*.). Losey testified that she indicated in her police statement that she overheard the man state to the woman "I will run your ass down." (*Id*. at 31). On cross-examination, Losey testified that she did not witness any physical violence between the couple in the store, but that Myers was on her phone trying to call someone and crying while they were standing in line. (*Id*. at 32). Losey also overheard Miller tell Myers that he did not owe her any money, and he owed money to someone else. (*Id*. at 33). Losey testified that she did not witness any physical injuries on Myers, though she was not looking for them, either. (*Id*.).

{¶18} Napoleon Police Department Patrolman Nicholas Evanoff testified that, on November 10, 2011, he investigated a reported domestic violence incident at the Wal-Mart in Napoleon, Henry County, Ohio. (*Id*. at 35). Patrolman Evanoff testified that he contacted Miller, and Miller informed him that he told Myers that he was breaking up with her and moving out of her residence while on his way to pick her up at the library. (*Id*. at 35-36). Miller also informed Patrolman Evanoff that Myers threatened to call the police and report that he hit her if he did not give her $175 that he allegedly owed her. (*Id*. at 35-36). On cross-examination, Patrolman Evanoff testified that he did not document any injuries upon the victim in this case. (*Id*. at 37). On redirect, Patrolman Evanoff testified that it is hard to get a bruise or any photograph of injuries on the stomach area due to the soft tissue. (*Id*. at 38). Patrolman Evanoff testified that he asked Myers if she had any visible injuries, and she stated she had none. (*Id*. at 39).

{¶19} At this point, the State rested, and Miller moved for an acquittal under Crim.R. 29(A), which the trial court denied. (*Id*. at 39-41). Thereafter, the defense presented the testimony of the defendant. (*Id*. at 41).

{¶20} Miller testified that he was currently residing between two addresses, 103 Mervin Street and 9398 County Road N., both located in Antwerp, Ohio. (*Id*. at 42). Miller testified that Myers' grandmother lives at the County Road N address, and Myers would not allow him to legally reside with her since it would

negatively impact her ability to obtain food stamps. (*Id*.). Miller testified that his Uncle Ed Miller and Aunt Donna Miller live at the Mervin Street address, and between the dates of August 18, 2011 to November 10, 2011, he spent nights at this address. (*Id*.). Miller testified that he never resided with Myers' grandmother, but he did stay with Myers at her home, which is located at 9396 County Road N. (*Id*.). Miller testified that Myers was his girlfriend. (*Id*. at 43). Miller testified that his ex-wife, April, and he lost custody of their children to the State of Alabama in February 2009, and he was trying to regain custody of his children. (*Id*. at 43-44). Miller testified that, three weeks prior to the incident in this case, he informed Myers that he needed to leave her residence to obtain a larger residence to accommodate his children. (*Id*. at 44). Miller testified that Myers made multiple trips to the emergency room from September to October, and he believed that these medical trips negatively impacted his ability to regain custody of his children since his previous wife had prescription drug problems. (*Id*. at 45).

{¶21} Miller testified that, prior to picking up Myers at the library, he called her and informed her could not live with her anymore since he wanted to regain custody of his children. (*Id*. at 46). Miller testified that Myers told him that if he did not stay with her, she would report her car stolen. (*Id*.). Miller testified that, when he arrived at the library, he exited the vehicle and attempted to

walk away from her and the car when Myers informed him that she had his check in her possession. (*Id.* at 46). According to Miller, Myers told him that he owed her $175, but he only owed her just over $70 for money he owed her child and her niece for band boosters and money he borrowed to get family pictures for Myers. (*Id.* at 46-47). Miller testified that Myers wanted the extra money for her car payment, which he normally paid because she was unemployed due to absenteeism and her failure to fill out work forms. (*Id.* at 47). Miller testified that he did not strike Myers while riding to Wal-Mart, and he was wearing his seatbelt during the ride. (*Id.*). Miller testified that, when they parked the car at Wal-Mart, Myers told him that if he did not pay her the $175, something bad was going to happen to him. (*Id.* at 48). Miller testified that Myers then threatened to make sure that he never sees his children again, and Myers still had his check in her right pocket during this conversation. (*Id.*). Miller testified that they exited the vehicle and walked toward Wal-Mart while she was verbally berating him, and they went directly to the customer service center. (*Id.*). According to Miller, about the time they reached the customer service center, Myers stated that she should call the cops and report that he hit her. (*Id.* at 49). Miller testified that he told Myers he would give her the money, and Myers then handed him the check, at which point Miller called Myers' father to ask him if Myers damaged any of his property. (*Id.*). Miller testified that Myers' father indicated that the property was

not destroyed and he would return his property. (*Id.*). Miller then hung up the phone and told Myers that he was not going to give her the money, and Myers stated she was going to call the police, which is when the customer service woman at Wal-Mart asked if Myers needed assistance. (*Id.*). Miller testified that, after the police were called, he walked directly to the sheriff's department to have a third party collect his property. (*Id.*).

{¶22} Miller testified that he was not checked for any physical injuries. (*Id.* at 50). He further testified that, because of her short stature, Myers sits with the drivers' seat all the way forward so that there is no room between her and the steering wheel. (*Id.*). Miller testified that there is a center console with a gear shift between the two front seats of the car. (*Id.*). He further testified that it is physically impossible to strike someone in the left abdomen with the right hand when belted in the passenger seat of the vehicle with the steering wheel, center console, and gear shift in the way. (*Id.* at 50-51). Miller testified that Myers has stomach issues, and she needs a portion of her stomach removed, which were the probable cause of her reported stomach pain. (*Id.* at 51).

{¶23} On cross-examination, Miller testified that he helped Myers with her car payment as a courtesy and since he was using the car on occasion. (*Id.* at 52). Miller testified that he had sex with Myers when he lived with her, and they helped each other prepare meals "[t]o an extent." (*Id.*). Miller testified that he

washed his own laundry, and his mail was sent to Myers' grandmother's residence. (*Id*. at 53). Miller testified that he purchased his own food, and he lived with Myers for two months. (*Id*. at 53-54). Miller denied threatening to run Myers down as Losey testified. (*Id*. at 55).

**{¶24}** Miller first argues that the State failed to present sufficient evidence of venue. However, Miller failed to raise venue as an issue in his Crim.R. 29 motion before the trial court, and therefore, has waived it for appeal purposes. (Dec. 8, 2011 Tr. at 40); *State v. Kremer*, 3d Dist. No. 15-05-05, 2006-Ohio-736, ¶ 6. Regardless, the testimony at trial sufficiently demonstrated that the domestic violence incident occurred within Henry County, Ohio, the jurisdiction of the Napoleon Municipal Court. (Dec. 8, 2011 Tr. at 6, 16, 29, 35); R.C. 1901.02(B).

**{¶25}** Miller next argues that the State failed to present sufficient evidence that Myers was a "household member" under R.C. 2919.25. We disagree. The State presented sufficient evidence to demonstrate that Myers was a "household member" under R.C. 2929.25(A), because she qualified as a "person living as a spouse." R.C. 2919.25(F)(1)(a)(i), (F)(2). The testimony at trial demonstrated that Miller and Myers were "boyfriend and girlfriend," lived together for almost three months just prior to the incident, had a sexual relationship, and shared expenses and meals together. Consequently, we reject Miller's sufficiency argument with respect to this element of the offense.

**{¶26}** We also cannot conclude that Miller's domestic violence conviction was against the manifest weight of the evidence. Myers testified that Miller struck her with his right fist left of the center of her abdomen while she was driving him to Wal-Mart. While Miller denied this allegation, Losey, an independent witness, testified concerning events subsequent to the physical altercation, and Losey's testimony supported Myers' version of the events. Although there was no photographic evidence of an injury, Patrolman Evanoff testified that the lack of any physical evidence in this case was not surprising given that the injury was to the soft tissue of the victim's abdomen. The emergency room report admitted into evidence indicated a final diagnosis of "abdominal pain, headache, anxiety attack," all consistent with Myers' version of the events. Both Miller's and Myers' credibility was questioned at trial—Miller's due to the State removal of his children and his previous driving infraction and Myers' due to her alleged involvement in defrauding the government in obtaining food stamps. It appears that the trial court ultimately believed Myers' testimony over Miller's testimony, and credibility is primarily for the trier of fact, who is in a better position to view the demeanor of the witness. *DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus. Viewing the evidence presented at trial, we cannot conclude as a matter of law that Miller's conviction was against the manifest weight of the evidence.

**{¶27}** Miller's first and second assignments of error are, therefore, overruled.

**{¶28}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**